**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ESTATE OF STEPHEN PUZA, JR., by Leah Puza, and Helena Barker-Puza, and as Co-administrators of the Estate of Stephen Puza, LEAH PUZA, HELENA BARKER-PUZA, REBECCA FOX, STEPHEN PUZA III,, AND SARA PUZA, a minor, by her parent and natural guardian RADA MCLEAN,** | : | **No. 3:03cv2183** |
| | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **CARBON COUNTY, ANGELA DEMYANOVICH, JOHN GABLICK, A. ORSULAK, RONALD PECK, SERGEANT STEVER, JOHN DOE, true name unknown, intended party being an architect, and CRABTREE, ROHRBAUGH & ASSOCIATES, INC.,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

_____Before the court for disposition in this case involving a prison suicide are motions for summary judgment filed by Defendant Crabtree, Rohrbaugh & Associates and one filed jointly by Carbon County, Angela Demyanovich, John Gablick, A. Orsulak, Ronald Peck, Sergeant Stever and John Doe (hereinafter "The County Defendants").  The motions have been briefed and argued.  They are thus ripe for disposition.

**Background**

Lansford Pennsylvania Police arrested Decedent Stephen Puza on February 20, 2002 after a domestic dispute with his wife, Helena.  (Doc. 75-4, Deposition of Helena Barker-Puza at 47-49).  He had been drinking alcohol and had thrown a kitchen knife at Helena who suffered no physical injuries.  (Id.).

Lansford Police Chief James Strauss arrested Stephen and transported him to the Lansford Police station, to his preliminary

arraignment and then to the jail for his detention.  (Doc. 75-5, Deposition of James B. Strauss at 30- 31, 36, 38).  He spent "at least" one and a half hours with him.  (Id. at 97).

At the jail, Stephen met Defendant Angela Demyanovich, a corrections officer at the prison.  (Doc. 75-10, Deposition of Angela Demyanovich at 30).  She recognized Stephen evidently from a prior incarceration in 1999.  (Id. 22, 40-4, 60).   During a previous incarceration, this one in 1998, Stephen had been placed on suicide watch after indicating during the suicide screening that he would consider suicide if he "could find a nice way to do it."  (Doc. 75-6, Suicide Screening Form 1998, ¶ 9).

Demyanovich completed a suicide screening form with Stephen that included a checklist of factors that the officers consider in determining whether a suicide watch is necessary.  (Doc. 75-11, Suicide Screening From 2002).   Upon completing the screening, Demyanovich concluded that Stephen was not a suicide risk and did not place him on a suicide watch.   (Doc. 75-10, Deposition of Angela Demyanovich at 47-48).

After the suicide screening, Defendant A. Orsulak, another corrections officer, strip searched Stephen and took him for a shower. (Doc. 75-13, Orsulak's Incident Report).  Stephen sang while showering. (Id.).  Stephen was then placed in a cell.

Later on, Defendant Corrections Officer John Gablick observed Stephen crying when he passed his cell.  (Doc. 75-14 Deposition of John Gablick at 12).   Gablick again saw him crying, this time softly, approximately a half hour later.  (Id. at 19).  Defendant Gablick saw Stephen laying on his bed a half hour later, which was fifteen minutes

2

before Gablick completed his shift.  (Id. at 37, 41).

Defendant Ronald Peck came on duty when Gablick left.   When he passed Stephen's cell at approximately 10:55 p.m., he noticed Stephen kneeling by the toilet.  (Doc. 75-16, Deposition of Ronald Peck 49).   Later, Peck passed the cell again and noticed Stephen still kneeling by the toilet. A few minutes later he returned, and Stephen was in the same position. Peck then banged on the door.  When he received no response, Peck called for backup and upon entering the cell found that Stephen was dead. (Doc. 75-18, Peck's Incident Report).

Stephen had removed his shoelace, tied it to a ventilation grate above the toilet and tied the other end around his neck.  He then strangled himself by kneeling in front of the toilet and applying pressure to his neck. (Id.)

Plaintiffs instituted the instant action against both the County Defendants and the architects who designed the prison.  The claims against the County Defendants are for civil rights violations under 42 U.S.C. § 1983, and the claims against the architects sound in negligence. At the close of discovery two motions for summary judgment were filed, one by the County Defendants and one by the architects.   We will address each set of defendants separately and develop the facts with regard to each motion below where appropriate.

**Jurisdiction**

As this case is brought pursuant to 42 U.S.C. § 1983 for violation of federal constitutional rights, we  have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  We  have

supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Standard of review**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the

4

nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Discussion**

We will first discuss the claims raised by CRA.

**I. CRA's claims**

CRA advances the following arguments: 1)  As a matter of law, a prison architect cannot be liable for the suicide of an inmate; 2) Even if defendant CRA had a duty to prevent prison suicides, it did not breach that duty because it did not select the grille from which decedent hung himself and it did not determine the height of the vent; and 3) Summary judgment is warranted because plaintiffs failed to file a timely certificate of merit or motion for extension as required by Pennsylvania Rule of Civil Procedure 1042.   We will address these issues *in seriatim*.

**A.  Architect liability for prison suicide**

CRA's initial argument is that as a matter of law, an architect cannot be held liable in tort for the suicide of a prisoner in a prison it designed. The parties have cited no Pennsylvania cases that are directly on point, and our research has uncovered none.  The general rule, under Pennsylvania law, however, is that liability cannot be imposed upon third parties for another's suicide.    McPeake v. Cannon, 553 A.2d 439, 440-41 (Pa. Super. Ct. 1989).  The Superior Court has explained: "Generally, suicide has not been recognized as a legitimate basis for recovery in wrongful death cases. This is so because suicide constitutes an independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor." Id.

5

Several exceptions to the general rule exist.  For example,  a hospital, mental health institution or mental health professional with a custodial relationship with the decedent has a recognized duty of care.  Id. at 441.  If the decedent was not associated with a hospital or mental health institution, there must be a clear showing of a duty to prevent the suicide and a direct causal connection between the alleged negligence and the suicide.  Id.  The third exception is a wrongful death action brought under the worker's compensation statute.  Id.

In the instant case, CRA did not have a custodial relationship with the decedent.  Additionally, this case does not involve a wrongful death action brought under the worker's compensation statute.  Thus, CRA does not fall under these exceptions.  The only other exception possible is whether there is a clear showing of a duty to prevent the suicide and a direct causal connection between the alleged negligence and the suicide.  The plaintiffs have also failed to establish this exception.

As noted above, Pennsylvania courts have not addressed this issue; however, the jurisdictions that have specifically addressed the issue have held that an architect cannot be held liable for a prison suicide.   For example, the Ninth Circuit Court of Appeals has noted, in applying Oregon law, that the mere fact that a prisoner finds a way to commit suicide in a standard jail cell does not give rise to liability on the part of the architect who designed the cell.  Lyche Estate v. Washington County, 171 Fed. Appx. 217, 218 (9th Cir. 2006).  In Lyche, the prison had been turned over to the county approximately one year before the suicide.   The court explained that any other approach besides the "no liability" approach would "risk exposing jail architects to endless suicide liability despite a county's

6

own decisions about design and about placement of prisoners in particular cells within a facility." Id. (internal quotation marks and footnote omitted). See also, Bruzga v. PMR Architects, P.C., 693 A.2d 401, 403 (N.H. 1997) ("We refuse to extend suicide liability to architects, contractors, engineers, and a vast array of other parties involved with the design and construction of buildings . . . . Architects and contractors should not be exposed to endless suicide liability when they have relinquished their authority and control over the facility to the owner."); La Bombarbe v. Phillips Swager Associates, Inc., 474 N.E.2d 942, 944-45 (Ill. App. Ct. 1985)("The magnitude of the burden placed on architects to eliminate all fixtures, such as grilles, that might be of aid in the commission of a suicide and, at the same time, to design an attractive and feasible cell at a reasonable cost would seem to be great."); Tittle v. Giattina, Fisher & Co., Architects, Inc., 597 So.2d 679, 681 (Ala.1992)("We hold . . . that an architect designing a prison or jail owes no duty to design the prison or jail to suicide-proof.").

Based upon these cases, and the absence of authority from the Pennsylvania courts, we find that plaintiffs have failed to establish a clear duty on the part of the architects to the prevent the decedent's suicide or that CRA's actions directly caused the suicide.  Accordingly, none of the exceptions to the general rule that prohibits recovery from third party for the suicide of another applies, and summary judgment for CRA is appropriate.

As we have found that the architects cannot be held liable for the suicide we need not address the other two issues raised by CRA, that is that they did not select the grille at issue or the height of the vent.   We also need not address their argument that plaintiffs failed to file a certificate

of merit.

## II.  The County Defendants

The County Defendants have also filed a motion for summary judgment.   These defendants are:  Carbon County, which constructed and owns the jail; Angela Demyanovich, a Carbon County Correctional officer who completed decedent's commitment paperwork; John Orsulak, a Carbon County Correctional Officer who helped process decedent when he was brought to jail; John Gablick, a Carbon County Correctional Officer who observed decedent in his cell; Ronald Peck, a Carbon County Correctional Officer who discovered decedent's body; Wayne Nothstein, a Carbon County Commissioner and member of the prison board; Tom Gerhard, a former Carbon County Commissioner and a former member of the Prison Board; Charles Getz, a Carbon County Commissioner and a member of the Prison Board; William F. Juracka, Warden of the Prison; James Youngkin, Deputy Warden of the Prison; Dwight Nothstein, Sheriff of Carbon County and a member of the Prison Board.

The plaintiffs allege that the County Defendants violated the plaintiff's Fourteenth Amendment rights and bring suit under 42 U.S.C. § 1983. The County Defendants raise seven (7) issues in their summary judgment motion.  We find the first two issues raised by the defendants to be dispositive of the case and will only address those issues.

## A.  14th Amendment claim

Plaintiffs have brought a section 1983 claim.  To establish a claim under section 1983, two criteria must be met.  First, the conduct complained of must have been committed by a person acting under of color of state law.  Second, the conduct must deprive the complainant of

rights secured under the Constitution or federal law.  Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). Section 1983 does not, by its own terms, create substantive rights.  Rather, it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws.  United States v. Kneipp, 95 F.3d 1199, 1204 (3d Cir. 1996).

In the instant case, the defendants are unquestionably state actors. Additionally, the Third Circuit Court of Appeals has held that a plaintiff may recover for a prison suicide as a constitutional claim under section 1983 action.[1]   Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir. 1991).   Recognizing that a suicide is ultimately the result of a prisoner's own self-destructive behavior, the court has further noted that a prison is not a guarantor of a prisoner's safety.  Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988).   A court "cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care."  Id. Thus certain factors have been developed that must be established in order for a valid constitutional claim

---

[1]As the decedent was a pretrial detainee, the plaintiffs' claim is examined under the Fourteenth Amendment's substantive due process protection against arbitrary abuse of government power" as opposed to the Eighth Amendment prohibition against cruel and unusual punishment. Schuenemann v. United States, No. 05-2565, 2006 WL 408404 (3d Cir. Feb. 23, 2006) (citing Colburn v. Upper Darby Twp., 838 F.2d 663, 668 (3d Cir. 1988)).  This right of a pretrial detainee is at least as great as a sentenced and convicted prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment.  Boring v. Kozakiewicz, 833 F.2d 468, 471-72 (3d Cir. 1987).

9

to be made out.  In order to establish a constitutional violation for a prisoner's suicide, the plaintiffs must demonstrate:

1) the decedent was particularly vulnerable to suicide, i.e., a strong likelihood existed that he would attempt suicide;

2) the defendants were deliberately indifferent to that vulnerability, i.e., they knew of a strong likelihood of suicide and disregarded that risk by failing to take reasonable measures to address it; and

3) the decedent would have survived if defendants had not been deliberately indifferent.  Woloszyn v. County of Lawrence, 396 F.3d 314, 320-21 (3d Cir. 2005), see also, Third Circuit Model Civil Jury Instructions § 4.11.2

The first factor is that the decedent was particularly vulnerable to suicide.  The Third Circuit Court of Appeals has indicated that a particular vulnerability to suicide means that "there must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."  Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005) (quoting Colburn, 946 F.2d at 1024).

Plaintiffs assert that they have an expert witness who concludes that the decedent fell within a large number of the potential suicide factors contained in the prison's suicide policy and reasonably trained and competent corrections officers would have determined his suicide potential. To establish that Puza had a particular vulnerability to suicide plaintiffs present an expert report of psychiatrist Stefan P. Kruszewski, M.D., who summarizes his findings as follows:

> 1. He [the decedent] is a *Caucasian middle-aged male*, placing him in the high risk category in the demographics of those individuals who commit suicide

10

2.  He had significant *mood swings* on afternoon and night of his booking.
3.  He was *alcoholically intoxicated*.
4.  He had the stress of learning that his *wife was unfaithful*.
5.  He suffered the potential *loss of his intimate relationship*.
6.  He had the stress of *repeat arrest and incarceration*.
7.  He had the *potential loss of his family*.
8.  Since his previous wife had also been unfaithful and they subsequently divorced, he would have been *suffering posttraumatic-like stress emotional turmoil* since the previous situation was being reenacted
9.  He had a *previous history of depression*, including 'major depression.'
10.  He had a *previous treatment with a prison psychiatrist* (Dr. Harold Paschal,
11.  He was *currently receiving, but now removed from, psychiatric care* in the community.
12. He was *taking antidepressant medications*, pills which were no longer available to him while he was at the prison.
13.  He had a history of *impulsivity, anger rage disruptiveness, and aggression* specifically induced or *exacerbated by alcoholic drinking*.

(Doc. 87, Ex. 1, at 6.)(emphasis in original).

The County Defendants address the decedent's vulnerability to suicide in relation to the second factor -   that the defendants were deliberately indifferent to that vulnerability, i.e., they knew of a strong likelihood of suicide and disregarded that risk by failing to take reasonable measures to address it.  The Third Circuit has explained that deliberate indifference in these matters is not examined objectively, but rather subjectively.  Woloszyn, 396 F.3d at 312  The court must examine what the prison officials were actually aware of as opposed to what they should have been aware of.   Id.

To be liable on a deliberate indifference claim, a . . . prison official must both know of and disregard an excessive risk to inmate health or safety.  The. . . element of deliberate indifference is subjective, not objective. . . meaning that the official must actually

11

> be aware of the existence of the excessive risk; it is
> not sufficient that the official should have been
> aware.  However, a subjective knowledge on the
> part of the official can be proved by circumstantial
> evidence to the effect that the excessive risk was so
> obvious that the official must have known of the
> risk.  Finally, a defendant can rebut a prima facie
> demonstration of deliberate indifference either by
> establishing that he did not have the requisite level
> of knowledge or awareness of the risk, or that,
> although he did know of the risk, he took
> reasonable steps to prevent the harm from
> occurring.

Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001)).

The County Defendants argue that plaintiffs fail to state a Fourteenth Amendment claim against the individually named defendants because they did not subjectively know that Stephen Puza was suicidal.

Because of the nature of the analysis, prison suicide cases are very fact sensitive and it is informative to review several cases that have been decided by the Third Circuit Court of Appeals to determine whether the plaintiff can establish reckless indifference or merely negligence.

In Freedman, supra, the prisoner had large prominent scars, called "suicide hesitation cuts" on his wrists, the inside of his elbows and neck from previous suicide attempts.   Prison officials saw these cuts, but nonetheless, did not treat the prisoner as a suicide risk.  The prisoner in Freedman hung himself from the air vent in his cell with his shirt.  853 F.2d 1111, 1113.   There had been at least one similar suicide attempt in the jail and one actual similar suicide.  Id.  The Third Circuit ruled that the failure of the prison officials to recognize the scars as "suicide hesitation cuts" was merely negligence, and therefore, did not support a section 1983 claim.

By way of contrast, in Colburn, the court did find enough evidence to support a claim of reckless indifference where there were obvious scars on the prisoners wrists, the township's police were familiar with the prisoner

12

and knew the she had jumped from a window the preceding day, the detaining officer had to prevent her from swallowing three Valium pills, and live ammunition was found in her pocket.  Additionally, the prisoner committed suicide by shooting herself with a gun she had concealed on her person.  The searching officer did not find the gun although the decedent was scantily dressed in a halter top and shorts.  <u>Colburn</u>, 838 F.2d 670, 664-65.

In this instant case, the subjective knowledge of the defendants is not as great as that in either of these two cases.  Of the defendants, Lansford Police Chief James Strauss, spent the longest time with decedent the day in question, nearly one and a half hours.  ((Doc. 75-5, Deposition of James B. Strauss at 97).  Strauss indicates that he had a pleasant conversation with the decedent and that the suicide was a complete surprise to him as Puza was the last person he expected to commit suicide.  (Doc. 75-5, Deposition of Strauss, 89).  Puza made no comments indicating that he was a danger to himself.  During the time they were together, Puza did not seem depressed to Strauss, they joked around.  "He seemed good going in the prison."  (<u>Id.</u> at 89-90).

Officer Demyanovich spent approximately fifteen minutes with Puza and completed a suicide screening form.  (Doc. 75-10, Deposition of Angela Demyanovich at 95-96).  As part of the screening, Demyanovich asked Puza if he had suicidal thoughts.  He indicated that he had much to look forward to, and he did not believe in suicide.  (<u>Id.</u> at 20).  Puza joked with officers, which Demyanovich took as a positive sign that he was not depressed.  (<u>Id.</u> at 40, 47-48).  Notably, although the decedent was not placed on suicide watch, he was placed in a cell next to an inmate who

13

was on suicide watch.  When the corrections officers checked on that inmate, they were evidently also able to observe the decedent.  (See, e.g., Doc. 75-18, Peck's Incident Report).

Defendant Demyanovich was the intake officer.   Plaintiffs assert that Demyanovich noted that the decedent was intoxicated, staggering and had a strong odor of alcohol.   She did not, however, examine his record from his previous prison stay when he had been put on suicide watch.  In other words, plaintiffs argue that Demyanovich had a duty to review plaintiff's previous records.

This claim that Demyanovich had a positive duty to examine the plaintiffs' records is without merit.  As set forth above, the focus is on what the defendants subjectively knew, rather than what they should have known.  In Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir. 1990), an arrestee, Ronald Williams, committed suicide by hanging himself from the ceiling of his cell with his belt.  Id. at 462.   Williams had previous contact with the police by threatening to jump off the fifth floor of a parking garage.  Id.  In another incident, he drove his car into a wall and he also attempted to electrocute himself in a bathtub.   Id.  He also tried to cut his wrists while in the presence of police officers.  Id.  at 463.  He also came in contact with the police by lying in the road and trying to get hit by a car.  He was arrested by an officer and then threatened to jump off of a bridge.  Id. In examining whether the officers at issue should have known of Williams suicidal tendencies, the court focused not on whether they should have reviewed the records and reviewed this rather extensive history, but whether they actually knew of Williams' history of suicide attempts.  Id. at 466.

14

In the instant case, plaintiffs have presented no evidence that Defendant Demyanovich knew of the decedent's prior placement on suicide watch.  They have presented no evidence to establish that she acted with deliberate indifference.  Therefore, summary judgment will be granted in favor of Defendant Demyanovich.

Defendant Orsulak was present during the intake and suicide screening.  Plaintiffs assert that a jury may conclude that his post incident statement was an effort to avoid his own liability for not interceding and by backing up his fellow correctional officer.  These contentions are nothing than mere speculation with no support in the record.   Summary judgment will thus be granted to Defendant Orsulak.

Defendant Gablick saw "red flags" such as the decedent singing in the shower and then shortly thereafter crying. Particularly, Gablick testified at his deposition as follows:

> Q Did you indicate to CO Peck the behavior that you observed?  And just to reiterate, the singing in the shower followed up by crying, followed up by a second of crying.
> A.  I believe I may have mentioned the singing in the shower and the crying, and I believe I mentioned that he was possibly in drinking.
> Q So why is it that you would have mentioned to Officer Peck that he was singing in the shower, then he was crying, then he was crying again and you think he might have come in drinking, why would you have told him those things?
> A Because those are things that we need to watch for.
> Q Why?
> A Because that's part of the suicide training, sir.
> Q.  So it's your understanding that these are potential red flags?
> A Yes, sir.
> Q And what I mean by that is if you have someone that has the kind of mood swings that you observed with Mr. Puza, singing followed by crying

> and alcoholism, which you base on just the odor, those are red flags that would indicate that the person has a potential risk of suicide?
>     A Not necessarily potential risk of suicide but they are an individual who would need to be watched or at least have an eye kept on them, not necessarily a documented watch but take a look at them.

 (Doc. 75-14, Deposition of John Gablick at 27-28).

Gablick informed Defendant Peck of these observations when leaving his shift because he knew that they were red flags.  Plaintiffs have presented no evidence that these "red flags" are in fact evidence that Defendant Gablick knew that the decedent suffered from a particular vulnerability to suicide.  Moreover, the plaintiffs have not established that he engaged in deliberate indifference.   The uncontested fact that he informed the oncoming officer of the decedent's behavior in fact establishes that he was not deliberately indifferent.  Notably, the decedent was placed in a cell that was next to a cell where an inmate was on suicide watch.  When the corrections officers checked on that inmate, they also observed the decedent.

     Defendant Peck took over for Gablick.  He saw decedent "kneeling by the toilet" although his view was obscured by the privacy wall.  He did nothing because inmates often use the toilet as a writing surface.  (Doc. 75-16, Deposition of Ronald Peck at 53). Twenty minutes later, Peck observed decedent still at toilet, he called for an assistant and decedent was found dead.  (Doc. 75-18, Peck Incident Report).  Once again, the plaintiffs have not established that Peck knew of a particular vulnerability to suicide or that Peck was deliberately indifferent.  He noted that the decedent was at the toilet on his first observation and then intervened when he was still in that position on his second observation.  The jury could not found based upon

16

those facts that he was deliberately indifferent.

Based upon all these facts, and the case law as set forth above, we find that the plaintiff has not established that the defendants were deliberately indifferent to that vulnerability, i.e., they knew of a strong likelihood of suicide and disregarded that risk by failing to take reasonable measures to address it.  Accordingly, summary judgment will be granted to the individual defendants.

### B.  Lack of training/deficient policies

Plaintiff asserts that Carbon County should be liable for its lack of training and deficient policies.  The Carbon County Defendants move for summary judgment on these claims.  After a careful review, we agree with the defendants.

In order to prevail, plaintiffs must:   a) identify specific training not provided that could reasonably be expected to prevent the suicide; and b) demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives. Woloszyn, 396 F.3d at 325.

In this case, the jail had a suicide policy that was annually reviewed by the Pennsylvania Department of Corrections, which never found the policy deficient. (Doc. 75-1, Deposition of Edward Phister, at 89). Screening forms are used to determine if incoming inmates are a suicide risk.  (Doc. 75-12, Suicide Policy).  It was used in this case and decedent's response did not trigger a suicide watch.

Plaintiffs do not identify any specific training that the Prison Board

17

was aware of that would have prevented the suicide.  Plaintiffs present the

report of R. Paul McCauley, Ph.D., BCFE, a criminologist,  who discusses

the lack of training and supervision. McCauley concludes that:

> The [Carbon County Correctional Facility, CCCF]
> knew or should have known` that it was foreseeable
> for an inmate to use his shoelace to hang himself in
> his cell.  Nevertheless, all inmates routinely were
> permitted to keep their shoelaces, unless on suicide
> watch.  Furthermore, the corrections officers were
> not directed by policy or trained to provide one
> another with detailed, chronological, written
> inmate/patient information, as collected by the
> booking officer, duty corrections officers, and
> supervisors.  As a result, CCCF policies and staff
> facilitated Mr. Puza's suicide.

Doc. 93-2 at 20.

He also indicates that the failure to investigate past suicides lead to the

failure to prevent the instant one.  This expert report is not sufficient to

defeat defendants' motion for summary judgment.  The expert does not

specify exactly what an investigation into these past suicides would have

revealed that would have prevented the instant suicide.  Similarly, Prof.

McCauley provided an expert report in Woloszyn, supra.  In Woloszyn,

McCauley opined as follows:

> The facility failed to have in place appropriate intake
> documents necessary to the evaluation and
> prevention of suicide; The facility failed to have in
> place a policy which would have resulted in
> Woloszyn either being placed in a cell for prisoners
> at risk for suicide or with another person.  Instead,
> Mr. Woloszyn was assigned a cell with vented bunk
> (i.e. with an open hole through which a blanket
> could be tied) and a blanket.  Mr. Woloszyn's
> suicide occurred by use of the vent and blanket;
> The staff was not qualified to assess and prevent
> suicide; Emergency medical equipment was not
> located and personnel were not properly trained in
> its use."

Id. at 325.

In that case, the Third Circuit Court of Appeals found: "The training

18

deficiencies McCauley identified are as broad and general as they are conclusory.  Prof. McCauley does not identify specific training that would have alerted LCCF personnel to the fact that Wolosyzn was suicidal[.]" Woloszyn, 396 F.3d at 325.

Likewise, we are unconvinced that the proffered expert's conclusion creates a genuine issue of material fact with regard to whether the defendants' alleged lack of training and policies led to the instant suicide.

Moreover, we cannot find based upon that facts as set forth above, that the defendants were negligent in failing to take the decedent's shoelaces.  It is, perhaps, foreseeable, for a prisoner to commit suicide by using his shoelaces.  The question, however, is not whether the defendant's acted in a manner reasonably calculated to make the suicide of a prisoner impossible, but rather, whether the defendants acted without deliberate indifference to the prisoner.  We conclude that allowing the defendant to retain his shoelaces was not deliberate indifference.  See Campbell v. City of Philadelphia, CIV.A. No. 87-0854, 1989 WL 7728 (E.D.Pa. February 1, 1989) (finding under the facts of that case that the failure of the police to remove decedent's shoelaces, without more, did not support a negligence claim).

Based upon the above reasoning, plaintiffs do not have a legal theory upon which they can prevail thus rendering moot the remainder of the issues.[2]   Accordingly, summary judgment will be granted to the defendants.

---

[2]These issues include: Is Carbon County liable where Prison Board and not county bears the legal duty of providing training and establishing policies for the jail; whether the individual members of the Prison Board are liable where, individually, the members have no legal authority to act; whether the supervisory defendants are liable on a respondeat superior

An appropriate order follows.

---

theory; whether defendants are immune from suit pursuant to the Political
Subdivision Tort Claims Act; and whether the individual defendants are
entitled to qualified immunity.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESTATE OF STEPHEN PUZA, JR., by | : | No. 3:03cv2183 |
| Leah Puza, and Helena | : | |
| Barker-Puza, and as | : | (Judge Munley) |
| Co-administrators of the Estate | : | |
| of Stephen Puza, LEAH PUZA, | : | |
| HELENA BARKER-PUZA, | : | |
| REBECCA FOX, STEPHEN | : | |
| PUZA III,, AND SARA PUZA, a | : | |
| minor, by her parent and | : | |
| natural guardian RADA MCLEAN, | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| CARBON COUNTY, ANGELA | : | |
| DEMYANOVICH, JOHN GABLICK, A. | : | |
| ORSULAK, RONALD PECK, SERGEANT | : | |
| STEVER, JOHN DOE, true name unknown, | : | |
| intended party being an architect, and | : | |
| CRABTREE, ROHRBAUGH & | : | |
| ASSOCIATES, INC., | : | |
| **Defendants** | : | |

# ORDER

**AND NOW**, to wit, this 26th day of September 2007, the defendants'
motions for summary judgment (Doc. 71 and Doc. 72) are **GRANTED**.  The
Clerk of Court is directed to enter judgment in favor of the defendants and
close this case.

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court